IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 8, 2002

## STATE OF TENNESSEE v. ROLAND G. RANSOM

**Direct Appeal from the Criminal Court for Shelby County**
**No. 99-09710    W. Fred Axley, Judge**

---

**No. W2001-00530-CCA-R3-CD - Filed February 4, 2002**

---

Pursuant to a negotiated plea agreement, the defendant pled guilty to facilitation of the sale of cocaine greater than 0.5 grams for an agreed sentence of four years, with the manner of service to be determined by the trial court. Following a sentencing hearing, the trial court denied alternative sentencing. In this appeal, the defendant challenges the denial of alternative sentencing. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

William D. Massey, Memphis, Tennessee, for the appellant, Roland G. Ransom.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephen P. Jones and William D. Bond, III, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

A brief recitation of the underlying facts, as stated by the prosecuting attorney at the guilty plea submission hearing, is appropriate.

> The officers followed [co-defendant Arthur] Deaton to the Piggly Wiggly store on Watkins where Deaton got into the undercover officer's vehicle and drove them to 1737 Clare, which was a home owned by defendant Ransom . . . .

Ransom came out of the home and approached this decoy vehicle. [He] told the detectives that Ray, who was [co-defendant] Raynard Parks, was on the way home with the ounce of powder cocaine and the detectives needed to come inside and wait. Deaton asked to see the money and the officers showed it to them. They went inside the location.

Moments later Ransom began calling to Ray Parks telling him that they needed an ounce of powder cocaine and that customers were waiting and then inquired about how long it would take. Approximately twenty minutes after being inside the house at 1737 Clare, Ray Parks, who was also the homeowner of that location, arrived home and instructed Deaton to come to the bathroom with him. Seconds later Ray Parks told the detectives to go to the bathroom where Deaton still was located. Upon entering they saw Deaton weighing a white powder substance on a digital scale. Then the undercover officer handed Deaton nine hundred and eighty dollars of marked OCU funds in exchange for the white powdery substance. [The] take-down signal was given. Officers approached.

Co-defendant Parks gave verbal written consent to search the home . . . . Deaton had in possession [an] additional 6.0 grams, a total gross weight of powder cocaine, located in the front jean pocket. Marked OCU money, nine hundred and eighty dollars, was observed falling out of Deaton's pants leg.

Additionally, a search of the house revealed one bag of marijuana in a clear plastic bag in plain view on the kitchen table, [a]pproximately two ounces of marijuana. And a .38 caliber handgun was inside a dresser drawer located in Ray Parks's kid's bedroom.

A large bag of marijuana was found inside a garbage can located in the kitchen. Ten dollar – a ten dollar bag of marijuana was found inside the air conditioning closet. Seven and a half bags of marijuana was found inside a box located in the kitchen. Under the kitchen table was seven hundred and sixty-five dollars cash underneath a cushion of the kitchen chair. [An] additional 4.0 grams total gross weight of powder cocaine [was] located inside a shoe box on the kitchen table.

Some powder cocaine, 1.3 grams, [was found] on the floor in the co-defendant Ray Parks's closet in his bedroom. A hundred and fourteen [dollars] cash [was found] in co-defendant . . . Ray Parks's bedroom under his mattress, and a total of one thousand three hundred and two dollars of cash [was] located partly in co-defendant Ray Parks's front right pants pocket and in his top dresser drawer in his bedroom.

A total of twenty-one eighty-one dollars – two thousand one hundred and eighty-one dollars was seized from Ray Parks as proceeds from narcotics sales, suspected proceeds from narcotics sales. All of the drugs did test positive.

## SENTENCING HEARING

### A. Testimony

The defendant, a 23-year-old high school graduate, was the only witness who testified at the sentencing hearing. He stated he was currently living with his parents and had a "good relationship" with them. Although he had no prior convictions, he had two prior arrests for disorderly conduct and public intoxication, which had been dismissed. The defendant further testified he was currently earning $6 per hour employed as a dishwasher and had started working about four weeks prior to the hearing.

The defendant, however, conceded he was unemployed at the time of the offense and was "making [his] living off of drug sales." The defendant had a very sporadic work history and had smoked marijuana for the preceding three years and as recently as one week prior to the hearing.

### B. Trial Court Findings

The trial court denied alternative sentencing, concluding:

Regarding his petition for suspended sentence. I have to consider the enormity of the offense. Twenty-five grams. A little over twenty-five grams of powdered cocaine. A lot. Nature and circumstances of the offense. You make the deal. Poor social history. You have a heavy steady drug habit. It's interfering with your life to the point where you violate the law, and you do things you ought not do.

I'm not going to give him Community Corrections. I will not give him a suspended sentence. I will place him in the correctional center for four years. And I am placing in special conditions of the judgment sheet, court-ordered drug rehab. Now, that's not Narcotics Anonymous, the twelve-step program. I'm talking about court-ordered drug rehab at the correctional center. The recidivism rate is less than two percent, if you complete it out there. In other words, you don't come back. You get off drugs and you stay off drugs.

It's a firm belief of this Court, if I can get him off drugs successfully, I can put him back out on the street earlier than the four years. But he's going to do that program before he goes anywhere else. He's got a good mind – he had a good mind. High school graduate from Millington Central. I don't see a lot of high school graduates. So, that's your job. You get through the drug program, I'll let you out.

## STANDARD OF REVIEW

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

Under the Criminal Sentencing Reform Act of 1989, trial courts are encouraged to use alternatives to incarceration. An especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6).

In determining if incarceration is appropriate, a trial court may consider the need to protect society by restraining a defendant having a long history of criminal conduct, the need to avoid depreciating the seriousness of the offense, whether confinement is particularly appropriate to effectively deter others likely to commit similar offenses, and whether less restrictive measures have often or recently been unsuccessfully applied to the defendant. Tenn. Code Ann. § 40-35-103(1).

There is no mathematical equation to be utilized in determining sentencing alternatives. Not only should the sentence fit the offense, but it should fit the offender as well. Tenn. Code Ann. § 40-35-103(2); State v. Batey, 35 S.W.3d 585, 588-89 (Tenn. Crim. App. 2000). Indeed, individualized punishment is the essence of alternative sentencing. State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). In summary, sentencing must be determined on a case-by-case basis, tailoring each sentence to that particular defendant based upon the facts of that case and the circumstances of that defendant. State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986).

## ANALYSIS

The defendant, a Range I standard offender, pled guilty to facilitation of the sale of cocaine greater than 0.5 grams, a Class C felony; thus, he was statutorily presumed to be a favorable candidate for alternative sentencing. *See* Tenn. Code Ann. § 40-35-102(6). The trial court, however, concluded there was adequate evidence to rebut the presumption and denied alternative sentencing. Officers seized over 25 grams of cocaine and a substantial quantity of marijuana. The trial court properly considered the large amount of drugs as a factor to deny alternative sentencing based on the nature and circumstances of the offense. *See* State v. Alexander A. Lee, No. W1999-01804-CCA-R3-CD, 2000 WL 1840077, at *3 (Tenn. Crim. App. Dec. 14, 2000, at Jackson), *perm. to app. denied* (Tenn. 2001). Furthermore, it is apparent from the locations and amounts of cocaine and marijuana seized, as well as the large amount of cash seized, that this was no small drug operation. In fact, the defendant conceded he was "making [his] living" at the time of his arrest from the sale of illegal drugs. The trial court further found the defendant was a poor candidate for alternative sentencing based on his poor social history; he had a sporadic work history; and he was a long-time

drug user, even using marijuana one week prior to the sentencing hearing, evidencing a significant history of criminal conduct.

Considering the defendant's history of criminal conduct, the seriousness of the offense based upon the nature of the drug operation, and the trial court's stated intention to grant alternative sentencing once the defendant completes the drug rehabilitation program, we conclude the trial court did not err in its denial of alternative sentencing at the time of sentencing.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.


_____
JOE G. RILEY, JUDGE